UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MWANA A. SANDERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-15-1342-M |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner, ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant.[1] ) | |

## REPORT AND RECOMMENDATION

Plaintiff Mwana A. Sanders brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. United States District Judge Vicki Miles-LaGrange has referred Plaintiff's case to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b). Upon review of the administrative record[2] and the arguments and authorities submitted by the parties, the undersigned recommends that the Commissioner's final decision be reversed and the case

---

[1] Nancy A. Berryhill has replaced Carolyn W. Colvin as the Acting Commissioner of the Social Security Administration. Accordingly, Nancy A. Berryhill is hereby substituted as the named Defendant to this action. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

[2] Citations to the administrative record (Doc. No. 10) are as "R. __," using the pagination assigned by the SSA in the certified copy of the transcript of the administrative record. Citations to other documents filed in this Court use the pagination assigned by CM/ECF.

be remanded under the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings.

PROCEDURAL HISTORY AND ADMINISTRATIVE DECISION

Plaintiff filed her SSI application on August 7, 2012, alleging disability because of chronic pain, bipolar disorder, anxiety attacks, and back problems. R. 183-98, 226. Following initial denials of Plaintiff's application, a hearing was held before an Administrative Law Judge ("ALJ") on April 23, 2014, at which Plaintiff and a vocational expert ("VE") testified. R. 65-94, 95-106, 107-22. The ALJ issued an unfavorable decision on July 25, 2014. R. 46-64.

The Commissioner uses a five-step sequential evaluation process to determine whether an adult is "disabled" within the meaning of the Social Security Act. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009); 20 C.F.R. § 416.920. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 7, 2012. R. 48. At step two, the ALJ found that Plaintiff had the following "severe" medically determinable impairments: "degenerative disc disease status post cervical fusion, chronic pain syndrome, major depressive disorder, PTSD, panic disorder, and schizoaffective disorder." R. 48. At step three, the ALJ determined that Plaintiff's severe impairments did not meet or medically equal any of the presumptively disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 48-50.

The ALJ next assessed Plaintiff's residual functional capacity ("RFC") based on all of her impairments. R. 50-58. The ALJ found that

> [Plaintiff can] lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit for about 6 hours during an eight-hour workday and can stand and walk for about 6 hours during an eight-hour workday. The claimant can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. The claimant cannot climb ladders, ropes, or scaffolds. The claimant can occasionally reach overhead. The claimant can frequently feel. The claimant can occasionally push/pull. The claimant can have no exposure to vibrations and hazards, such as unprotected heights and heavy machinery. The claimant can understand, remember, and carry out simple, routine, and repetitive tasks. The claimant can respond appropriately to supervisors, co-workers, and usual work situations, but have occasional contact with the general public.

R. 50. At step four, the ALJ found that Plaintiff had no "past relevant work" as that term is defined in the governing regulations. R. 58.

At step five, the ALJ considered whether there are jobs existing in significant numbers in the national economy that Plaintiff—in view of her age, education, work experience, and RFC—could perform. R. 58-59. Relying on the VE's hearing testimony, the ALJ found that Plaintiff could adjust to "work that exists in significant numbers in the national economy," such as housekeeper, laundry worker, and mail sorter. R. 59; *see* R. 91-92. Therefore, the ALJ concluded that Plaintiff had not been disabled within the meaning of the Act between August 7, 2012, and July 25, 2014. R. 59-60. The Appeals Council declined to review that decision. R. 1-5.

## STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited to determining whether factual findings are supported by substantial evidence in the record as a whole and whether correct legal standards were applied. *Poppa v. Astrue*, 569 F.3d 1167, 1169 (10th Cir. 2009). "Substantial evidence is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (internal quotation marks omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004) (internal quotation marks omitted). The court "meticulously examine[s] the record as a whole," including any evidence "that may undercut or detract from the ALJ's findings," "to determine if the substantiality test has been met." *Wall*, 561 F.3d at 1052 (internal quotation marks omitted). While a reviewing court considers whether the Commissioner followed applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment for that of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).

## ANALYSIS

Plaintiff presents several reasons, explained to varying degrees, why the ALJ's RFC assessment is legally flawed or not supported by substantial evidence in the record. *See* Pl.'s Br. (Doc. No. 12) at 6-16. As relevant here, Plaintiff argues that the ALJ's mental RFC assessment is flawed because: (1) Plaintiff's severe depression, PTSD, panic disorder, and schizoaffective disorder are not reflected in the ALJ's RFC determination; (2) the RFC does not reflect the ALJ's step-three finding that Plaintiff "has moderate difficulty" in social functioning and maintaining concentration, persistence, or pace; (3) the ALJ did not cite any evidence to support his finding that Plaintiff "can respond appropriately to supervisors, co-workers and usual work situations"; and (4) the ALJ did not explain "why

4

he believed [Plaintiff] could maintain employment." *Id.* at 12, 14-15, 17-18, 20. The undersigned finds that Plaintiff's first, third, and fourth objections have merit and warrant remand for further administrative proceedings.[3]

A. *The Relevant Evidence*

On July 27, 2012, Plaintiff established care with Haisam Al-Khouri, MD, at OKC Psychiatric Services because she was "having paranoia, hearing whispers, [and] seeing shadows in the house." R. 437. On examination, the intake clinician observed that Plaintiff exhibited "flight of ideas," poor memory, paranoid delusions, and a dysphoric mood and labile affect, and that Plaintiff endorsed auditory-visual hallucinations. R. 437-38. The

---

[3] Plaintiff's second objection is based on a misrepresentation of the record. *See* Pl.'s Br. at 18-21 (citing *Jaramillo v. Colvin*, 576 F. App'x 870 (10th Cir. 2014)). Contrary to Plaintiff's assertion, the ALJ's RFC determination did not limit Plaintiff "to unskilled work" without more. *Compare id.* at 20, *with* R. 50, 55. Rather, the ALJ specifically found that Plaintiff retained the mental capacity to "understand, remember, and carry out simple, routine, repetitive tasks," "respond appropriately to supervisors, co-workers, and usual work situations," and "have occasional contact with the general public." R. 50. Further, Plaintiff does not explain why these work-related functional limitations are inconsistent with the ALJ's step-three finding that Plaintiff has "moderate difficulties" in social functioning and maintaining concentration, persistence, or pace. *See* Pl.'s Br. at 18-21; *cf. Vigil v. Colvin*, 805 F.3d 1199, 1203 (10th Cir. 2015) ("The ALJ's finding of a moderate limitation in concentration, persistence, or pace at step three does not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment."). Accordingly, this argument fails. *See Duncan v. Colvin*, No. CIV-15-1200-D (W.D. Okla. Feb. 17, 2017) (R. & R.) (rejecting similar argument), *adopted*, 2017 WL 972127 (W.D. Okla. Mar. 10, 2017). The undersigned reminds Plaintiff's counsel, once again, that this Court does not "favorably view arguments based on misrepresentations of the record." *Kirkpatrick v. Colvin*, 663 F. App'x 646, 650 n.2 (10th Cir. 2016) (citing *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000)); *see also Gaines v. Comm'r*, No. CIV-15-1251-M, Order to Show Cause (Doc. No. 21) at 2 (W.D. Okla. Mar. 10, 2017) (Goodwin, M.J.) (citing nine cases where counsel "has been advised, by this Court and the Tenth Circuit, about the seriousness of misrepresenting the record in court filings").

clinician diagnosed Plaintiff with "bipolar I," "mixed," with psychotic features and prescribed two medications "for mood stabilization" and psychosis. R. 438. Plaintiff saw Dr. Al-Khouri once every few weeks between August and November 2012. *See* R. 427-36. Dr. Al-Khouri consistently observed that Plaintiff endorsed paranoid delusions and auditory-visual hallucinations during this time. R. 429, 430, 431, 433, 434. Plaintiff occasionally exhibited an irritable, dysphoric, or anxious mood; labile or restricted affect; impaired insight or judgment; and decreased concentration or attention. R. 429-35. Plaintiff's memory and thought processes were always intact and she was always cooperative during her visits with Dr. Al-Khouri. *See id.* Dr. Al-Khouri prescribed more than a dozen medications to treat Plaintiff's bipolar disorder and psychosis, and Plaintiff reported that she took those medications as prescribed. *See* R. 427-35, 457-58.

In December 2012, Plaintiff had a consultative psychological evaluation with Kara Rodgers, PsyD. R. 441-43. Plaintiff reported that her current medications, which she described as "a mood stabilizer, something for sleep, an antidepressant, and an antipsychotic medication," reduced her auditory and visual hallucinations. R. 442. Dr. Rodgers observed that Plaintiff "appeared to have no difficulty expressing her thoughts clearly" and "did not evidence any signs of a thought disorder or psychotic process" on examination. R. 442. Dr. Rodgers opined Plaintiff's "anxiety seem[ed] to be such that she would have difficulty functioning in public environments." R. 443.

On December 31, 2012, a state-agency psychologist reviewed Plaintiff's mental health records available through that date. R. 96-107, 125-26. The psychologist opined

that Plaintiff had a "non-severe" affective disorder and anxiety-related disorder, R. 99-102, and that Plaintiff was "expected to return to her prior level of functioning within 12 months," R. 101. A second state-agency psychologist affirmed this assessment in April 2013. R. 116.

Plaintiff returned to Dr. Al-Khouri's office twice in February 2013. R. 457, 458. On February 6, Plaintiff reported that she was "feeling much better," with less anxiety, mood swings, [and] depression." R. 458. Dr. Al-Khouri observed that Plaintiff appeared "disheveled," exhibited a "flat" affect, and endorsed "delusions" but not hallucinations. R. 458. Dr. Al-Khouri changed Plaintiff's medications again and instructed her to return in two weeks. R. 458. On February 18, Plaintiff reported that her condition was "worsening" and that one of her medications was "not helping enough." R. 457. Dr. Al-Khouri observed that Plaintiff appeared depressed with a flat and anxious mood, exhibited decreased attention and concentration, and endorsed auditory-visual hallucinations. R. 457. Her thought process, memory, speech, associations, judgment, and insight were all within normal limits. R. 457.

In September 2013, Dr. Al-Khouri referred Plaintiff for emergency treatment at a hospital due to "increased paranoid ideations and decreased ability to function within normal parameters." R. 575. Plaintiff reported that she "really wanted to hurt people who mess with [her]" and explained that she "started feeling this way a couple of days ago" after Dr. Al-Khouri changed her medications. R. 575 ("[T]he voices are saying to hurt someone by running over them with a car."). The intake record contains the following

summary of Plaintiff's spouse's description of Plaintiff's mental condition and functioning:

> Spouse reports [Plaintiff] is having paranoid delusions which have impaired [her] ability to function and [are] causing significant problems in her interactions with others. Spouse reports [Plaintiff] is suspicious of everyone and this has created an attitude of confrontation and open hostility even towards her own family, and especially with strangers. [Plaintiff] challenges anyone she feels [is] watching her, even drivers of other vehicles who come up behind [Plaintiff] travelling down the road. . . . . [Plaintiff] is unable to perform at her baseline level of functioning.

R. 575. The intake record also states that "[t]his is a recurrent problem" and that "[p]recipitating factors include recent stress." R. 570. There is no indication that Plaintiff had discontinued medication treatment at this time. *See* R. 572, 575.

Plaintiff was involuntarily admitted to the psychiatric unit at St. Anthony's Hospital under an emergency order of detention. R. 569. Treatment notes indicate that she initially exhibited psychiatric signs, or endorsed psychiatric symptoms, including homicidal ideation, auditory-visual hallucinations, paranoia, anxiety, poor judgment, "dangerous behavior," "difficulty dealing with stress," and "ineffective problem solving." *See* R. 643-45, 649-51. By the fourth day, Plaintiff reported that she was "no longer hallucinating and even feels happy." R. 581; *see also* R. 705-14. Still, clinicians consistently observed that Plaintiff expressed difficulty solving problems and dealing with stress and remained guarded, anxious, and withdrawn throughout her hospitalization. *See, e.g.*, R. 660, 666, 697, 711, 720, 722, 729, 731, 734-35, 742, 746. It took eight days for Plaintiff's mental condition to stabilize enough that she "no longer require[d] 24 hour care." R. 752.

Plaintiff returned to the St. Anthony's emergency room on January 27, 2014. R. 761. Plaintiff's spouse reported that Plaintiff "has been taking psychiatric meds" that

8

were "causing her to act different[ly]," including that she was experiencing auditory-visual hallucinations, paranoia, and memory loss. R. 761 ("Husband states [patient] is unable to care for herself and is on too many meds."). At the time, Plaintiff's "active" medication list included eight drugs prescribed to treat psychosis, major depressive disorder, manic-depression, anxiety, and insomnia. R. 763-64. The attending physician arranged for police officers to transport Plaintiff to the Oklahoma County Crisis Intervention Center ("OCCIC") that evening. *See* R. 483, 767. A note on Plaintiff's OCCIC intake record indicates that a licensed mental health professional ("LMHP") "from St. Anthony's describ[ed] Ms. Sanders as med compliant but still very depressed, responding to command [hallucinations] and memory lapses and most important turning the gas on the stove w[ith]out the flame." R. 483 (noting Plaintiff's comment that she "did not know" she left the gas stove on). Plaintiff also reported feeling as though "people [were] following her, trying to hurt her," and seeing and hearing "little kids . . . saying 'kill, kill, kill.'" R. 488. The admissions record reflects an intention that Plaintiff would be discharged from OCCIC once her "thought processes and/or perceptual disturbance" improved and she "demonstrate[d] behavioral control acceptable for return" to her "structured, supportive and safe discharge environment" at home with her husband. R. 488; *see also* R. 499.

The next day, January 28, 2014, Plaintiff told an OCCIC nurse that "the meds she was on were working" but that she had been "off her medication [for] a week and started to feel homicidal." R. 494. Plaintiff reported seeing shadows and hearing "voices that say, 'kill, kill, kill'" on her third day at OCCIC. R. 495-96. On January 30, Plaintiff reported

9

that she was "feeling much better" and her new medications were "working better than what she was on" before she was admitted to OCCIC. R. 497. Nursing staff observed that Plaintiff was "bright" and "cheerful" and that she was "interacting with select peers." R. 497. Plaintiff was discharged from OCCIC at her own request on January 31, 2014, a few days earlier than expected. R. 490; *see* R. 486.

In early February 2014, Plaintiff established care at Hope Community Services to manage her medications and attend counseling. *See* R. 491, 497, 534, 542-63. Plaintiff reported "hearing children playing," feeling as though "someone [was] watching her all the time," difficulty concentrating, and "[g]etting frustrated for almost no reason." R. 539, 543-44. On examination, the clinician noted that Plaintiff's mental status was within normal limits except that she exhibited an anxious and dysphoric mood. R. 540. The clinician prescribed five medications and instructed Plaintiff to return in four months "or sooner if needed." R. 539-40.

Ten days later, Plaintiff went to OCCIC to refill her Xanax and Restoril, and possibly her Seroquel. R. 500. Plaintiff explained that "she usually goes to Hope Center to refill" her medications but "she no longer has insurance" and Hope Center would not refill these medications. R. 500. Plaintiff reported that she had been off her medication for three days and was seeing "shadow people" and hearing voices again. R. 500. The provider noted that Plaintiff appeared to be "actively hallucinating." R. 501. Plaintiff went back to Hope Center on March 11, 2014. R. 535-36. She reported hearing "whispers" occasionally but denied hearing voices or experiencing visual hallucinations. R. 535. On

examination, the clinician noted that Plaintiff's mental status was within normal limits except that she exhibited a "constricted" affect and endorsed auditory hallucinations. R. 536. This is the last mental health treatment note in the record.

B. *The ALJ's Decision*

The ALJ found at step two that Plaintiff's major depressive disorder, PTSD, panic disorder, and schizoaffective disorder were "severe" medically determinable impairments because they "impose[d] more than slight restrictions in the ability to perform basic work activities."[4] R. 48. In making this determination, the ALJ "gave little weight" to the two state-agency reviewers' opinions that Plaintiff had "non-severe mental impairments" with only "mild limitations" in social functioning and maintaining concentration, persistence, or pace. R. 57; *see also* R. 49-50, 100, 115. The ALJ explained that "[t]he evidence of record submitted at the hearing level shows that the claimant has limitations due to her mental impairments, so her mental impairments are severe." R. 57.

In assessing Plaintiff's RFC, the ALJ found two limitations related to Plaintiff's mental impairments. The ALJ determined that Plaintiff "can understand, remember, and carry out simple, routine, and repetitive tasks" and can "have occasional contact with the

---

[4] "Basic work activities" are "the abilities and aptitudes necessary to do most jobs," such as "[u]nderstanding, carrying out, and remembering simple instructions"; exercising judgment; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b)(3)-(6).

general public." R. 50. The ALJ determined that Plaintiff "can respond appropriately to supervisors, co-workers, and usual work situations." R. 50.

*C. Discussion*

Plaintiff asserts that the ALJ's mental RFC determination is flawed because: it does not reflect the limiting effects of her "severe" depression, PTSD, panic disorder and schizoaffective disorder; the ALJ did not cite any evidence to support his finding that Plaintiff "can respond appropriately to supervisors, co-workers and usual work situations"; and the ALJ did not explain "why he believed [Plaintiff] could maintain employment." Pl.'s Br. at 12, 14, 15.

A claimant's RFC is a "function-by-function assessment" that represents "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite the total limiting effects of his or her medically determinable impairments and any related symptoms. SSR 96-8p, 1996 WL 374184, at *2, *3 (July 2, 1996) (emphasis omitted); *see also* 20 C.F.R. § 416.945(a)-(c), (e). "In assessing RFC, the [ALJ] must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." SSR 96-8p, 1996 WL 374184, at *7 (footnote omitted). "The RFC assessment must be based on *all* of the relevant evidence," *id.* at *5, and "must include a narrative discussion describing how the evidence supports each

conclusion, citing specific medical facts . . . and nonmedical evidence" in the record, *id.* at *7.

Here, the ALJ failed to adequately present his analysis, such that this Court could conclude that the ALJ made the required decisions and considered all the relevant evidence. In his written decision, the ALJ summarized Plaintiff's mental health records, R. 53-55, and then stated the conclusion: "Limiting the claimant to simple, routine, and repetitive tasks with occasional contact with the general public adequately accounts for the claimant's mental impairments." R. 55. The ALJ's RFC assessment does not describe Plaintiff's maximum ability to sustain work activities "in an ordinary work setting on a regular and continuing basis" and does not include the required "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence" in the record. SSR 96-8p, 1996 WL 374184, at *7. Further, the ALJ fails to confront significantly probative evidence of limitations greater than those reflected in the RFC. *See Blea v. Barnhart*, 466 F.3d 903, 915 (10th Cir. 2006) (an ALJ must discuss "the evidence supporting his decision," the "uncontroverted evidence he chooses not to rely upon," and any "significantly probative evidence he rejects" (internal quotation marks omitted)). A reviewing court may not properly determine how the ALJ reached the RFC determination when the ALJ "merely summarizes" much of the relevant evidence, states that he considered the entire record, "and then announces his decision." *Brant v. Barnhart*, 506 F. Supp. 2d 476, 486 (D. Kan. 2007) (internal quotation marks omitted).[5]

---

[5] Plaintiff objects that all of the mental impairments that the ALJ found to be "severe" at

- Limitation to Occasional Contact with Public

The ALJ failed to explain how he weighed conflicting evidence in concluding that restricting Plaintiff to "occasional contact" with the public "adequately accounts for [Plaintiff's] mental impairments," particularly her severe schizoaffective disorder. While initial reports and medical opinions reasonably may be read as indicating limitations consistent with the RFC, *see* R. 101, 116, 443, that is not so of later records, as detailed above. For example, in September 2013 Plaintiff's treating psychiatrist referred her for emergency treatment at a hospital due to "increased paranoid ideations and decreased ability to function within normal parameters." R. 575. Plaintiff's spouse told medical staff that Plaintiff's "paranoid delusions" made her "suspicious of everyone" and "created an attitude of confrontation and open hostility . . . especially with strangers." R. 575. The intake record states that "[t]his is a recurrent problem" and that "[p]recipitating factors

---

step two "must find their way into the RFC" at step four. Pl.'s Br. at 14. "[T]his argument overstates the impact of the agency's summary step-two evaluation on the detailed RFC determination at step four. At step two, the ALJ determines whether the claimant has a medically severe impairment—that is, an impairment that 'significantly limits a claimant's physical or mental ability to do basic work activities.'" *Johnson v. Berryhill*, No. 16-1076, 2017 WL 603830, at *3 (10th Cir. Feb. 15, 2017) (quoting *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016)). The required showing at step two "is *de minimis* and does not account for the ALJ's assessment, at step four, of the claimant's ability," *id.* (citation omitted), "to meet the physical, mental, sensory, and other requirements of work," 20 C.F.R. § 416.945(a)(4). "Thus, a finding that an impairment is severe at step two is not determinative of the claimant's RFC and cannot substitute for a proper step-four analysis." *Johnson*, 2017 WL 2017 WL 603830, at *3 (citing *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007)). "The question is not whether the RFC recounts or lists the 'severe' impairments at step two, but whether the RFC accounts for the work-related limitations that flow from those impairments." *Cavalier v. Colvin*, 13-CV-651-FHM, 2014 WL 7408430, at *2 (N.D. Okla. Dec. 30, 2014).

include recent stress." R. 570. Indeed, Plaintiff was hospitalized twice during the relevant period because she endorsed homicidal and paranoid ideation and could not regulate her behavior when interacting with other people. *See* R. 488, 569, 626.

Recognizing the probative value of this later evidence, the ALJ gave "little weight" to the early opinions of two reviewing psychologists because subsequent records showed Plaintiff "ha[d] limitations due to her mental impairments." R. 57.[6] The ALJ summarized the later evidence, including Plaintiff's psychiatric hospitalizations, but his description of the voluminous treatment records tends to emphasize the portions "favorable to his position," *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004), while improperly minimizing or omitting other portions indicating that Plaintiff's schizoaffective disorder renders her unable to handle even occasional public interaction in a normal work environment. *Compare* R. 55 (ALJ noting that Plaintiff's "condition improved quickly and substantially within a few days of treatment at the hospital" in September 2013, and that Plaintiff's "condition improved sufficiently for discharge [from OCCIC] . . . prior to the anticipated date" in January 2014), *with* R. 752 ("Reason for discharge . . . : Pt no longer requires 24 hour care"), *and* R. 499 (clinician noting Plaintiff was discharged from OCCIC because she was "not considered a danger to self or others" and "demonstrated acceptable behavioral control and improved thought process sufficient" to return home). Moreover,

---

[6] The ALJ did not discuss Dr. Rodgers' medical opinion that Plaintiff's "anxiety seem[ed] to be such that she would have difficulty functioning in public environments." R. 443; *see* R. 55-57.

15

the ALJ failed to adequately explain how, given the evidence of paranoia, hallucinations, and other significant difficulties in Plaintiff's functioning, that an RFC limitation to "occasional" public contact adequately accounts for Plaintiff's severe mental impairments.

- Absence of Limitation on Ability to Respond Appropriately to Supervisors, Coworkers, and Usual Work Situations

Similarly, the record contains medical evidence that, on its face, conflicts with the ALJ's unexplained finding that Plaintiff can respond appropriately to supervisors, peers, and usual work situations as the SSA interprets those work-related abilities and activities. *See* SSR 85-16, 1985 WL 56855, at *1-4 (Jan. 1, 1985). As noted, Plaintiff's medical records are replete with clinicians' observations that Plaintiff suffered from hallucinations and paranoid delusions which often interfered with her ability to interact with other people. *See, e.g.*, R. 433-35, 575, 628, 662, 676. There is also some indication that "stress" exacerbates Plaintiff's hallucinations and inability to regulate her "anger and hostility" towards others. R. 570. Social Security policy instructs that "individuals with paranoid tendencies may be expected to experience moderate to moderately severe difficulties in relating to coworkers or supervisors, or in tolerating normal work pressures." SSR 85-16, 1985 WL 56855, at *3. The ALJ's written decision provides no insight into whether, and if so how, he weighed this evidence in finding that Plaintiff can respond appropriately to supervisors, coworkers, and usual work situations.

- Absence of Other Limitations Relating to Ability to Maintain Employment

Finally, the ALJ failed to address evidence that Plaintiff's mental impairments limit her ability to cope with life pressures such that she can maintain employment. Plaintiff

16

correctly notes that it is not enough for the ALJ to conclude that the claimant "can work" despite his or her impairments—the ALJ must decide whether the claimant "could hold a job for a significant period of time in light of [those] impairments." *Weigel v. Astrue*, 425 F. App'x 706, 710 (10th Cir. 2011) (citing *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994)); *see* Pl.'s Br. at 15.

As detailed above, the record contains significantly probative evidence that, at least beginning in September 2013, Plaintiff's mental impairments caused "recurrent problem[s]," R. 570, in her ability to cope with ordinary life pressures. *See, e.g.*, R. 575, 649, 670, 676, 697, 725, 735. The ALJ's summary of the relevant records again tends to emphasize the portions "favorable to his position," *Hardman*, 362 F.3d at 681, while improperly minimizing or omitting other portions bearing on Plaintiff's ability to sustain employment during the relevant time. *Compare* R. 55 (ALJ's finding that Plaintiff's "condition improved quickly and substantially within a few days of treatment at the hospital" in September 2013), *with* R. 645, 660, 676, 691, 707, 722, 729 (clinicians noting that Plaintiff was "guarded" and exhibited "[d]ifficulty dealing with stress" and "ineffective problem solving" throughout her eight-day hospitalization in September 2013).

### D. Conclusion

The Tenth Circuit has recognized that "the need for express analysis is weakened" "[w]hen the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004).

17

Such is not the case here, as the record includes evidence that facially conflicts with the ALJ's determination of Plaintiff's mental RFC.

The ALJ's failure to adequately discuss this evidence and explain his conclusions requires that the matter be remanded for further proceedings. *See, e.g.*, *Weigel*, 425 F. App'x at 709-10 (ALJ's failure to "describe how the evidence supported his RFC conclusions" requires remand because it leaves district court unable to meaningfully review the Commissioner's final decision); *Southard v. Barnhart*, 72 F. App'x 781, 785 (10th Cir. 2003) ("Because the ALJ failed to make all the detailed findings required by the regulations and rulings. . . , his RFC conclusions are not supported by substantial evidence."). Because there is no "narrative discussion describing how the evidence supports [the ALJ's RFC] conclusion, citing *specific* medical facts . . . and nonmedical evidence,'" *Southard*, 72 F. App'x at 784 (ellipsis in original) (quoting 96-8p, 1996 WL 374184, at *7), the undersigned can only "speculate what specific evidence led the ALJ" to this RFC conclusion, *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001) (internal quotation marks omitted).

Defendant argues that the ALJ's RFC finding is supported by substantial evidence in the record. *See* Def.'s Br. (Doc. No. 16) at 9-15. But the Court may not reweigh the evidence or create "post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007). Remand is therefore required for the ALJ "to consider and discuss the relevant evidence, to provide reasons for accepting or rejecting the evidence, and to apply the

correct legal standards." *Weigel*, 425 F. App'x at 710 (citing *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)).

## RECOMMENDATION

For the reasons stated herein, the undersigned recommends that the Commissioner's final decision be reversed and that the case be remanded for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g).

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to file written objections to this Report and Recommendation in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. Any such objections must be filed with the Clerk of this Court by March 29, 2017. The parties further are advised that failure to timely object to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

## STATUS OF REFERRAL

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in this case.

ENTERED this 15th day of March, 2017.

CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE